IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARITTA ERICKSON,                              No. 3:22-cv-01208-HZ

                Plaintiff,                     OPINION & ORDER

     v.

HILLSBORO MEDICAL CENTER and
TRANSAMERICA RETIREMENT
ADVISORS, LLC,

                Defendants.

Megan E. Glor
John C. Shaw
Megan E. Glor, Attorney at Law PC
707 N.E. Knott Street
Suite 101
Portland, OR 97212

      Attorneys for Plaintiff

Brian T. Kiolbasa
Lane Powell, PC
601 S.W. Second Avenue
Suite 2100
Portland, OR 97204-3158

      Attorneys for Defendant Hillsboro Medical Center

Stanton R. Gallegos
Markowitz Herbold PC
1455 S.W. Broadway
Suite 1900
Portland, OR 97201

      Attorneys for Defendant Transamerica Retirement Advisors, LLC

HERNÁNDEZ, District Judge:

This matter is before the Court on Defendant Hillsboro Medical Center's Motion for Entry of Judgment Under Rule 52, ECF 30; Plaintiff's Motion for Summary Judgment, ECF 31; and Defendant Transamerica Retirement Advisor's Motion for Entry of Judgment Under Rule 52, ECF 34. For the reasons that follow the Court grants in part and denies in part Hillsboro Medical Center's Motion for Entry of Judgment, grants in part and denies in part Plaintiff's Motion for Summary Judgment, and grants Transamerica Retirement Advisor's Motion for Entry of Judgment.

## BACKGROUND

Plaintiff Maritta Erickson began working as a registered nurse with Defendant Hillsboro Medical Center ("HMC")[1] on October 20, 1986. Plaintiff was a participant in the Tuality Healthcare Retirement Plan (the "Frozen Plan")[2] from November 1, 1987, through August 31, 2012, at which time the Frozen Plan was amended to freeze participation and benefit accruals. Plaintiff was a participant in the Tuality Healthcare Cash Balance Pension Plan (the "Cash Balance Plan") from September 1, 2012, through May 31, 2020. Plaintiff retired from HMC on June 15, 2020.

On June 24, 2020, Plaintiff wrote to HMC and Defendant Transamerica Retirement Advisors ("TRA") asserting that HMC erred in the calculation of her retirement benefits under the Frozen Plan. Specifically, Plaintiff asserted HMC failed to properly credit her with a "year of benefit service" for each of four years: 1996, 1997, 2000, and 2001. On June 26, 2020, Plaintiff

---

[1] HMC was Tuality Medical Center at the time Plaintiff was hired until November 2019.
[2] It is undisputed that HMC is the plan sponsor and administrator of the Frozen Plan and a fiduciary under the provisions of the Employment Retirement Income Security Act ("ERISA").

sent a second letter to HMC and TRA noting she had received employer-matched benefits from her 403(b) retirement account[3] in 1996, 1997, 2000, 2001, therefore, she believed she also met the Frozen Plan 1,000-hour threshold to be credited with a year of benefit service in each of those years. Plaintiff attached some of her paystubs and asserted they suggested that Defendants failed to include Plaintiff's "low census"[4] hours when calculating Plaintiff's hours of service for the years in question.

On September 24, 2020, HMC advised Plaintiff that it had "treat[ed] [her] inquiry as a formal claim for benefits" pursuant to ERISA and had reviewed the Frozen Plan documents, Plaintiff's pay records, and Plaintiff's 403(b) contribution records. Tr. 266.[5] HMC noted Plaintiff's 403(b) records indicated she did not receive employer-matched benefits in 1996, 1997, 2000, or 2001 because she did not have 1,000 hours of service in those years. In addition, records in HMC's "HR information system" either matched the paystubs Plaintiff provided or "exceeded the number of low census hours on [Plaintiff's] paystubs," but "in no instance did the paystubs [Plaintiff] provided reflect low census hours that [HMC's] records did not," therefore, HMC could not establish that Plaintiff's low census hours were incorrect. Tr. 267. Finally, HMC's records reflected Plaintiff had 959.71 hours of service in 1996, 937.92 hours of service in 1997, 934.25 hours of service in 2000, and 749.50 hours of service in 2001. Tr. 266. Plaintiff, therefore, did not have 1,000 hours of service entitling her to a year of benefit service under the

---

[3] The 403(b) plan required participants to have 1,000 hours of service per benefit year in order to receive employer-matched benefits.

[4] Low census occurs when a hospital has more nurses scheduled for work than are needed due to low numbers of patients.

[5] Citations to "Tr." refer to the page(s) indicated in the administrative record, filed herein as Docket No. 28.

Frozen Plan in any of those years. Accordingly, HMC denied Plaintiff's claim for retirement benefits for years 1996, 1997, 2000, and 2001.

Plaintiff requested copies of the documents related to her 403(b) contributions; copies of the policies and procedures relating to "how [HMC] counted vacation, sick, standby and low census toward the accumulation of the hours necessary to meet both employee match and pension accumulations of the 1000 hours"; "a breakdown of all of [her] hours by pay period from 1986 to 2020"; and an independent review of the denial. Tr. 273-74. On December 24, 2020, HMC provided Plaintiff with the requested documents and advised Plaintiff that it had begun the requested independent review.

On January 28, 2021, the HMC Fiduciary Committee conducted an independent review of the denial of Plaintiff's claim. On February 5, 2021, HMC advised Plaintiff that the fiduciary committee concluded HMC's denial was appropriate. Specifically, HMC's conclusion that Plaintiff did not have 1,000 hours of service in 1996, 1997, 2000, or 2001 and, therefore, was not entitled to a year of benefit service for any of those years was correct. Tr. 437-38. HMC advised Plaintiff that the independent review decision was "final and binding" and that Plaintiff had the right to bring "legal action under ERISA Section 502(a)." Tr. 438.

On April 9, 2021, TRA advised Plaintiff that during an audit of its benefit calculation system it discovered that the monthly amount of retirement benefits that Plaintiff had been receiving under the Frozen Plan had "been overstated [by $258.09 per month][6] since the commencement of [her] benefits on July 1, 2020." Tr. 167. TRA explained: "The portion of your Normal Retirement Benefit derived from your employment through December 31, 1987 was incorrectly applied as an annual value instead of a monthly value, causing your overall benefit to

---

[6] Plaintiff had received $1,636.26 per month; the corrected amount was $1,378.17 per month.

be overstated." Tr. 167. TRA advised HMC of the overpayment and was directed "to adjust

[Plaintiff's] monthly benefit payments," but Plaintiff would not be required to return the

overpaid amounts to the Frozen Plan. *Id*.

On April 26, 2021, Plaintiff wrote HMC disputing TRA's calculations. HMC treated

Plaintiff's letter as a formal claim for benefits. On May 20, 2021, HMC denied Plaintiff's claim

explaining:

> Under section 6.2(C) of the Plan, the pre-1988 benefit is equal to: "For each year . . . of Benefit Service . . . before January 1, 1988, 1 percent of the Participant's Monthly Earnings during each Plan Year."
>
> According to our records . . . your annual pre-1988 benefit was $249.57, which equates to $20.80 per month. The full annual benefit of $249.57 was mistakenly applied as a monthly benefit by [TRA], resulting in an overpayment of benefits.

Tr. 180. HMC also noted that § 8.4 of the Frozen Plan stated, "In the event a Participant or

Beneficiary receives an overpayment from the Plan, the Plan Administrator shall make

reasonable efforts to recover the overpayment . . . includ[ing], but . . . not limited to, [repayment

or] reducing future Plan benefits payable to the Participant or Beneficiary." *Id*. HMC did not

request that Plaintiff repay the overpayments, but instead reduced Plaintiff's future monthly

benefit payment to the corrected amount.

On August 9, 2021, Plaintiff appealed the pre-1988 plan benefits claim to HMC. Tr. 184-

85. On October 8, 2021, the HMC fiduciary committee denied Plaintiff's appeal. The fiduciary

committee noted that Article IV of the Frozen Plan set out the benefit formulas, TRA's internal

audit revealed that Plaintiff had been overpaid due to a calculation error in applying the Frozen

Plan formula, and the Frozen Plan provided authority for HMC to reduce Plaintiff's pre-1988

benefits in order to remedy the overpayment. Tr. 244-46. HMC advised Plaintiff that the

independent review decision was "final and binding"; that Plaintiff had the right to bring "legal

action under ERISA Section 502(a)"; and that "any further review, judicial or otherwise, . . . shall be based on the record before [HMC] and limited to whether . . . [HMC] acted arbitrarily or capriciously in the exercise of its discretion. In no event shall any such further review . . . be on a *de novo* basis." Tr. 246.

On August 16, 2022, Plaintiff filed an action in this Court against HMC and TRA asserting claims for payment of benefits, enforcement of the terms of the Frozen Plan, and clarification of future benefit rights pursuant to ERISA, 29 U.S.C. §§ 1132(a)(1)(B) and 1132(a)(3).

On May 26, 2023, HMC and TRA filed Motions for Entry of Judgment Under Rule 52 and Plaintiff filed a Motion for Summary Judgment, The Court took the matter under advisement on June 23, 2023.

## STANDARDS

### I.    Proper Procedural Mechanism

The parties agree the standard of review in this matter is abuse of discretion rather than *de novo.* The parties, however, disagree as to the proper procedural mechanism to bring the dispute before the Court. As noted, Defendants filed Motions for Entry of Judgment pursuant to Federal Rule of Civil Procedure 52. Plaintiff filed a Motion for Summary Judgment under Federal Rule of Civil Procedure 56.

Whether the Court proceeds under Rule 52 or 56 "depends on what standard of review the court applies." *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1311 (D. Or. 2012). The Ninth Circuit has held that "in an ERISA benefits case, [when] the court's review is for abuse of discretion, summary judgment is a proper 'conduit to bring the legal question before the district court.'" *Id.* (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), *overruled*

*on other grounds by Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 965 (9th Cir. 2006) (When "the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.")). *See also Harlick v. Blue Shield of Ca.*, 686 F.3d 699, 706 (9th Cir. 2012)("In the ERISA context, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.")(quotation omitted)).

As noted, the parties agree that the appropriate standard of review is abuse of discretion. The Court, therefore, proceeds under Rule 56 as applied in the ERISA context in which "the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Harlick*, 686 F.3d at 706.

## II.    Level of Review

The abuse-of-discretion standard is "deferential" and "a plan administrator's decision 'will not be disturbed if reasonable.'" *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012)(quoting *Conkright v. Frommert*, 559 U.S. 506, 512 (2010)). "The standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)(internal quotation marks omitted)). "Under the abuse of discretion standard, an administrator's denial of benefits must be upheld 'if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith.'" *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 957–58 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Aug. 18,

2016)(quoting *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir. 2000)). "The analysis is not based on 'whose interpretation of the plan documents is most persuasive, but whether the [administrator's] interpretation is unreasonable.'" *Moyle*, 823 F.3d at 958 (quoting *Canseco v. Constr. Laborers Pension Tr.*, 93 F.3d 600, 606 (9th Cir. 1996)(internal quotation marks omitted)). "The court must look to the plain language of the [Retirement Plan] to determine whether the [administrator's] interpretation of that plan is 'arbitrary and capricious." *Moyle*, 823 F.3d at 958 (quotation omitted).

The Ninth Circuit, however, has also noted "the degree of skepticism with which [the court] regard[s] a plan administrator's decision when determining whether the administrator abused its discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest." *Stephan*, 697 F.3d at 929. Although the existence of a conflict of interest does "not alter[] the standard of review itself," it "is a factor to be considered in determining whether a plan administrator has abused its discretion." *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). "The weight of this factor depends upon the likelihood that the conflict impacted the administrator's decisionmaking." *Stephan¸* 697 F.3d at 929. For example, the "level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied . . . by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968–69. On the other hand, a "court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record." *Id.* (citations omitted).

HMC's "dual role as plan administrator, authorized to determine the amount of benefits owed, and [as] insurer, responsible for paying such benefits, creates a structural conflict of interest." *Stephan*, 697 F.3d at 929. HMC, however, consistently provided the same reasons for denial of Plaintiff's benefits claims, obtained and reviewed the evidence necessary to evaluate Plaintiff's claims, and considered Plaintiff's evidence including employer contributions to her 403(b) plan and pay stubs provided by Plaintiff. In addition, there is not any evidence in the record that HMC repeatedly denied benefits to plan participants or acted with malice. The Court, therefore, gives little weight to HMC's structural conflict of interest.

## DISCUSSION

Plaintiff asserts HMC violated its duties under ERISA when it arbitrarily failed to credit Plaintiff with years of benefit service for 1996, 2000, and 2001[7]; arbitrarily computed Plaintiff's average monthly compensation under the Frozen Plan; and arbitrarily computed Plaintiff's pre-1988 monthly accrued benefit under the Frozen Plan. HMC contends its records of Plaintiff's hours of service for 1996, 2000, and 2001 are accurate and, therefore, Plaintiff was not arbitrarily denied benefits for those years under the plan and Plaintiff failed to exhaust her administrative remedies as to her average monthly compensation claim and her pre-1988 monthly accrued benefit claim.[8]

TRA incorporates all of HMC's arguments against Plaintiff's claims and additionally asserts it is entitled to entry of judgment in its favor because it is not a proper defendant under ERISA.

---

[7] Although Plaintiff alleged in her Complaint that HMC failed to properly credit her with a benefit year of service in 1997, Plaintiff withdrew that claim in her Response to Defendants' Motions.

[8] Plaintiff refers to this as her monthly accrued benefit part C claim.

## I.     TRA

As noted, TRA asserts it is entitled to judgment in its favor because it is not a proper defendant in this matter under ERISA.

"[P]roper defendants under § 1132(a)(1)(B) for improper denial of benefits at least include ERISA plans, formally designated plan administrators, insurers or other entities responsible for payment of benefits, and de facto plan administrators that improperly deny or cause improper denial of benefits." *Spindex Physical Therapy USA Inc. v. United Healthcare of Az., Inc.*, 770 F.3d 1282, 1297 (9th Cir. 2014). "Suits under § 1132(a)(1)(B) to recover benefits may be brought 'against the plan as an entity and against the fiduciary of the plan.'" *Id.* (quoting *Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1194 (8th Cir. 1998)(emphasis omitted)). In the ERISA context a fiduciary is "any entity that 'exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . [or] has any discretionary authority or discretionary responsibility in the administration of such plan.'" *Spindex*, 770 F.3d at 1298 (quoting ERISA, 29 U.S.C. § 1002(21)(A)).

TRA asserts it is merely the recordkeeper of HMC's plans. TRA did not fund the plans and was not responsible for denying Plaintiff's claims for benefits and, therefore, according to TRA, it is not a proper ERISA defendant. Plaintiff, relying on the Pension Services Agreement ("PSA") between TRA and HMC, asserts TRA has fiduciary duties "for retiree payment administration services in identifying and correcting in a timely manner transaction processing errors," and, therefore, it is a proper defendant under ERISA. Pl. Resp., ECF 37, at 15. TRA points out, however, that the PSA sets out limited fiduciary duties for TRA. Specifically, the PSA provides TRS "agrees to assume fiduciary responsibility only for the proper execution of

the specific and agreed-upon administrative procedures for the outsourcing services as outlined in this Section II. TRS does not assume fiduciary responsibility for services that are not described in . . . Section II." Tr. 1127, ECF 29. Section II of the PSA does not indicate TRA agreed to assume fiduciary responsibility for payment of benefits, management of the plans, or administration of the plans, nor does it provide TRA with authority to manage the plans or to administer the plans' assets. Rather, Section II reflects TRA agreed to assume fiduciary responsibility for things such as reviewing and evaluating domestic relations orders, preparing benefit election forms, reviewing benefit election forms for accuracy, conducting "weekly death audits for retirees," and notifying "terminated vested participants." Tr. 1227-28. The provision of the PSA that Plaintiff relies on for her assertion that TRA had relevant fiduciary duties is contained in the portion of the PSA addressing "float income and error correction policy" and is outside of Section II. As such, pursuant to the unambiguous terms of the PSA, TRA did not assume any fiduciary duties or responsibilities in that provision.

The Court, therefore, concludes on this record that Plaintiff has not established that TRA is a proper defendant. Accordingly, the Court grants TRA's Motion for Entry of Judgment and denies Plaintiff's Motion for Summary Judgment as to the issue of TRA's liability.

## II.     Years of Benefit Service

In calculating Plaintiff's frozen retirement plan benefit amount HMC credited Plaintiff with 21 years of benefit service. HMC did not credit Plaintiff with a year of benefit service for years 1996, 2000, and 2001 based on HMC's conclusion that Plaintiff did not have 1,000 hours of service in those years. Plaintiff alleges HMC's conclusion that Plaintiff did not have 1,000 hours of service in those years was arbitrary and, therefore, HMC's failure to credit Plaintiff with a year of benefit services for years 1996, 2000, and 2001, was also arbitrary.

The Frozen Plan provides a plan participant "shall receive one year of Benefit Service for each Plan Year . . . in which the Participant has 1,000 or more Hours of Service" through December 31, 2012. Tr. 31. The Frozen Plan defines hour of service in pertinent part as:

> Each hour for which an Employee is directly or indirectly paid or entitled to payment by an Employer for performance of duties during a Plan Year . . . and each hour during a Plan Year for which an Employee is directly or indirectly paid or entitled to payment on account of a period of time during which no duties are performed . . . because of vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or leave of absence.

Tr. 22. The Frozen Plan does not specifically address low census, but states:

> [A]n Employee shall also receive Hours of Service credit for mandatory days off without pay. . . . [F]or each mandatory day off, the Employee shall be credited with Hours of Service in an amount equal to the Hours of Service the Employee would have earned for that day under his or her regularly scheduled hours had he or she not had a mandatory day off.

Tr. 23.

The Summary Plan Description ("SPD") states participants "receive Hours of Service for time off without pay due to low census. . . . [F]or each mandatory day off, you will be credited with the Hours of Service you would have received for that day had you not had a mandatory day off." Tr. 123.

As noted, HMC's records reflected Plaintiff had 959.71 hours of service in 1996, 934.25 hours of service in 2000, and 749.50 hours of service in 2001. Tr. 266. HMC, therefore, concluded Plaintiff was not entitled to a year of benefit service for those years.

Plaintiff asserts that although HMC's records of Plaintiff's hours of service in the relevant years include credits for low census hours, *see, e.g.,* Tr. 325, 327, 329, Plaintiff had additional low census hours that HMC did not include in the calculation of her hours of service. To support her assertion Plaintiff testifies in her Declaration that she "frequently volunteered to

return home without pay ('low census' hours) and not work [her] regular scheduled hours if the

Hospital patient census was low and the Hospital had scheduled more nurses than were needed

for patient care." Erickson Decl., ECF 33, at ¶ 4. Plaintiff explains that she

> volunteered for "low census" hours initially for 2 reasons: 1) it allowed the
> Hospital to reduce the number of nurses scheduled to work when the
> patient census was low and the hospital was overstaffed, without having to
> impose a "mandatory day off" on one of my fellow nurses who needed the
> income more than I did and 2) It allowed me more time to do chores and
> upkeep on our 5 acre farm.

*Id*. at ¶ 5. After her children were born in 1989 and 1990, Plaintiff volunteered for low census

hours "so [she] could spend more time with [her] children and be more involved" in their

activities. *Id*. at ¶ 6.

Plaintiff contends HMC's records also support her assertion that HMC failed to credit all

of her low-census hours because HMC's records do not total the number of hours Plaintiff was

scheduled to work. For example, Plaintiff held a scheduled 54-hour position from January 1,

1996, through July 10, 1996, and a scheduled 36-hour position from July 11, 1996 through

December 31, 1996. HMC's records, however, reflect that in pay period one of 1996 HMC

credited Plaintiff with only 18 hours of service. Tr. 323. HMC's records did not account for the

other 36 hours that Plaintiff was scheduled to work in that pay period as a holiday, vacation,

illness, or similar. Other pay periods throughout 1996, 2000, and 2001, have similar

"unaccounted for" hours. Plaintiff asserts that these unaccounted for hours are likely low census

hours for which she should have been credited.

Defendants assert Plaintiff's arguments are insufficient to establish HMC abused its

discretion when it found she did not have 1,000 hours of service in 1996, 2000, and 2001.

Specifically, Defendants agree the SPD states participants receive "Hours of Service for time off

without pay due to low census," but note the Frozen Plan and SPD make clear that participants

would be credited for hours of service "for each *mandatory* day off." Tr. 23, 123 (emphasis added). According to Defendants, therefore, low census hours that were not mandatory were properly not credited as hours of service under the Frozen Plan.

The Frozen Plan does not define "mandatory," the Court, therefore, looks to the dictionary definition of mandatory to determine its meaning. *See Vaught v. Scottsdale Healthcare Corp. Health Plan,* 546 F.3d 620, 628 (9th Cir. 2008)("[T]erms in an ERISA plan should be interpreted in an ordinary and popular sense as would a [person] of average intelligence and experience. [When] a plan instrument does not define a term, we may look to the dictionary definition to determine the ordinary and popular meaning.")(quotations omitted)). The dictionary defines mandatory as "required by a law or rule : obligatory." "Antonym: voluntary." https://www.merriam-webster.com/dictionary/mandatory (last visited July 24, 2023). The Frozen Plan and SPD, therefore, do not appear to contemplate credit for hours of service for voluntarily taken low census hours.

Defendants note that Plaintiff stated in her benefits claim to HMC that she had "always been the 1st to volunteer to take voluntary low census, when offered" and, therefore, she expected to see more credit for low census hours on her hours of service. Tr. 253. As noted, Plaintiff also testifies in her Declaration that she "frequently volunteered to . . . not work [her] regular scheduled hours if the Hospital patient census was low" so that "one of [her] fellow nurses who needed the income more than" Plaintiff would not have to take "a mandatory day off." Erickson Decl., ¶¶ 4-5. According to Defendants, therefore, HMC did not abuse its discretion to the extent that it did not credit Plaintiff with any low census time that she volunteered to take, or when it concluded that Plaintiff's unaccounted for hours were voluntarily taken low-census hours.

Plaintiff asserts in her Reply that under the Frozen Plan she was entitled to receive credit for low census hours whether she volunteered to take low census hours or she was required to do so. Plaintiff, however, does not point to any provision of the Frozen Plan or the SPD that supports her position. Rather, as noted, both the Frozen Plan and the SPD provisions regarding hours of service state that participants are credited with hours of service only for mandatory low census hours.

The Court concludes on this record that HMC's decision regarding Plaintiff's hours of service was not illogical, implausible, or without support in the record. In fact, HMC's decision is supported by the terms of the Frozen Plan, the SPD, Plaintiff's time records, and Plaintiff's statements that she frequently volunteered to take low census hours so that other nurses would not have to take mandatory low census hours. HMC's decision is also supported by the fact that in the years at issue Plaintiff did not receive matching contributions under her 403(b) plan, which also required 1,000 hours of service before matching employees' contributions to that plan. HMC's decision was not unreasonable: it does not conflict with the plain language of the Frozen Plan and gives effect to all the Frozen Plan provisions. *See Wit v. United Behav. Health*, 58 F.4th 1080, 1097 (9th Cir. 2023)(finding the district court erred when it found the plan administrator abused its discretion because the plan administrator's interpretation of the plan was not unreasonable, it did not conflict with the plain language of the plan, and it gave effect to all of the plan provisions). The Court, therefore, concludes HMC did not abuse its discretion when it found Plaintiff did not have 1,000 hours of service in 1996, 2000, and 2001 and, therefore, was not entitled to a year of benefit service for each of those years.

Accordingly, the Court grants Defendants' Motions for Entry of Judgment and denies Plaintiff's Motion for Summary Judgment on the issue of Plaintiff's years of benefit service.

### III.    Average Monthly Compensation

Plaintiff asserts HMC abused its discretion when it computed Plaintiff's average monthly compensation using Plaintiff's annual salary for the years 2007 through 2011 rather than her salary from 2008 through August 31, 2021, because in doing so, HMC ignored the language of the Frozen Plan.

Defendants assert Plaintiff failed to exhaust her administrative remedies with respect to this issue because she did not raise it with the plan administrator before bringing this action. Even if Plaintiff has exhausted her administrative remedies, however, Defendants contend Plaintiff's claim also fails on the merits.

### A.    Exhaustion

"'ERISA itself does not require a participant or beneficiary to exhaust administrative remedies in order to bring an action under § 502 of ERISA, 29 U.S.C. § 1132.'" *Wit,* 58 F.4th at 1097 (quoting *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1088 (9th Cir. 2012)). "Instead, ERISA mandates an opportunity for administrative review, *see* 29 U.S.C. § 1133(2), and [the Ninth Circuit has] treated completion of this administrative review as a prudential exhaustion requirement." *Wit,* 58 F.4th at 1097-98 (citation omitted). "Accordingly, [the Ninth Circuit has] consistently held that before bringing suit under § 502, an ERISA plaintiff claiming a denial of benefits 'must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court.'" *Vaught,* 546 F.3d 626 (quoting *Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995)). ERISA's court-created exhaustion requirement, however, applies only if the relevant plan requires exhaustion. *Spinedex,* 770 F.3d at 1299.

The Frozen Plan provides that participants "can file a claim for benefits . . . at any time by personally delivering or mailing a written communication making the claim for benefits . . . to the Plan Administrator." Tr. 70-71. If a participant's claim is denied the participant "shall have the right to file a request with the Plan Administrator for a full and fair review . . . by personally delivering or mailing a written request for review . . . to the Plan Administrator" within 60 days of the denial. Tr. 72. If the Plan Administrator denies the claim on review, the Frozen Plan provides a participant may bring an action under ERISA. The Frozen Plan also provides that a participant's "failure to follow the claim review procedures shall constitute a waiver of any further review." Tr. 74. Plaintiff does not suggest that the Frozen Plan does not require her to exhaust the administrative remedies as set out in the Frozen Plan. Plaintiff, however, asserts that neither ERISA nor the Frozen Plan required her to raise with HMC all of her reasons for contesting the denial of her benefits in order to have exhausted her administrative remedies. According to Plaintiff, therefore, her failure to raise the issue of the calculation of her average monthly earnings with the Plan Administrator does not constitute a failure to exhaust her administrative remedies.

In *Vaught* an ERISA plan administrator asserted that the plaintiff "failed to avail himself of the Plan's internal review procedures by failing to raise all his reasons for contesting the Plan's denial of benefits in his initial appeal." *Vaught*, 546 F.3d at 629. The plaintiff's "claim for benefits . . . was based on a legal theory . . . that was not raised in his initial letter to the Claims Administrator, or in any of the further correspondence with" the Claims Administrator and, therefore, the defendant asserted the plaintiff failed to exhaust his administrative remedies. *Id.* The Ninth Circuit concluded that neither ERISA nor the plan documents required issue-exhaustion and, therefore, the plaintiff "was not required to exhaust [all of] his issues or

theories" before bringing an ERISA action. *Id.* at 632. Similarly, here the Frozen Plan does not require participants to raise and exhaust every issue underlying their requests for benefits. Because ERISA also does not require issue-exhaustion the Court concludes Plaintiff was not required to raise every issue with HMC before she asserted it as a basis for this action. The Court, therefore, concludes Plaintiff sufficiently exhausted the administrative process and has not waived her right to bring a claim in this action for HMC's alleged failure to properly calculate her monthly earnings.

**B.    Merits**

Under the Frozen Plan participants receive 1% of their highest average earnings for each year of benefit service after December 31, 1987 when calculating their retirement benefit. The Frozen Plan defines "highest average earnings" in pertinent part as:

> Average Monthly Earnings during the five consecutive Plan Years during which the Participant's Annual Earnings are the highest, subject to the following provisions:
>
> * * *
>
> (D) A Participant's Highest Average Earnings will be calculated using Compensation paid through August 31, 2012, or December 31, 2011, whichever would generate the larger benefit.

Tr. 20-21.

The Frozen Plan defines average monthly earnings as: "Annual Earnings divided by 12, except that for any short Plan Year, Monthly Earnings are the Annual Earnings during that short Plan Year divided by the number of full calendar months in that short Plan Year." Tr. 24. The Frozen Plan defines plan year as: "The 12-consecutive-month period beginning each January 1 and ending each December 31. Before March 1, 1980, the Plan Year was the 12-consecutive month period beginning March 1 and ending the day prior to the following March 1. March 1,

1980, through December 31, 1980, was a short Plan Year." Tr. 25. The Frozen Plan does not define "short plan year."

HMC used Plaintiff's annual salary for years 2007 through 2011 to calculate her average monthly compensation. Use of those years resulted in an average monthly compensation amount of $5,718.29. Plaintiff asserts that HMC should have used Plaintiff's salary from 2008 through August 31, 2012,[9] because use of that period "would generate [a] larger" average monthly compensation amount of $5,962.98. Plaintiff contends that HMC's failure to use Plaintiff's salary from 2008 through August 31, 2012, was arbitrary and unreasonable because it conflicts with the language of the Frozen Plan.

Defendants assert HMC properly used years 2007 through 2011 to calculate Plaintiff's average monthly earnings because 2012 was not a short plan year within the meaning of the Frozen Plan. Defendants concede that the term "short plan year" is not defined in the Frozen Plan, but note the Frozen Plan "makes clear that any 'short plan year' was capable of being identified as such.'" HMC Resp. to Pl.'s Mot. for Summ. J., ECF 36, at 16. Defendants assert that the Frozen Plan identified March 1, 1980 through December 31, 1980 as "the sole 'short Plan Year.'" *Id.* To support their assertion, Defendants point to several places in the Frozen Plan where the March through December 1980 time period is identified as a short plan year. *See, e.g.,* Tr. 11, 27, 32, 33.

Plaintiff points out, however, that HMC does not identify any provision of the Frozen Plan that requires the plan to specifically identify a short plan year. In addition, Plaintiff notes that the sections of the Frozen Plan relied on by Defendants do not state the March through

---

[9] As noted, HMC froze participation and benefit accrual under the Frozen Plan on August 31, 2012. Tr. 8.

December 1980 period was the sole short plan year. Rather, the definition of plan year specifically states "March 1, 1980 through December 31, 1980, was *a* short Plan Year," not the only short Plan Year. The definition of "plan year," therefore, contemplates short plan years other than March through December 1980. In addition, it is undisputed that HMC froze participation and benefit accrual under the Frozen Plan on August 31, 2012, thereby creating a short plan year similar to the March through December 1980 short plan year specifically identified in the Frozen Plan. Plaintiff also asserts the definition of highest average earnings specifically directs HMC to use the period through August 31, 2012 to calculate a participant's highest average earnings when it "would generate the larger benefit," as it would in this case.

On this record, the Court concludes HMC's decision to use the years 2007 through 2011 to calculate Plaintiff's average monthly earnings was arbitrary and unreasonable because it was not supported by the language of the Frozen Plan and did not give effect to all of the provisions of the Frozen Plan. Accordingly, the Court denies Defendants' Motions for Entry of Judgment as to calculation of Plaintiff's average monthly earnings and grants Plaintiff's Motion for Summary Judgment as to that issue.

## IV.    Pre-1988 Monthly Accrued Benefit

Plaintiff asserts HMC also arbitrarily and improperly calculated her pre-1988 monthly accrued benefit.[10] Plaintiff became a Frozen Plan participant on November 1, 1987. Plaintiff, therefore, had a partial year of benefit service from November 1, 1987, through December 31, 1987. The Frozen Plan provides in pertinent part:

> Upon retirement at normal retirement date, a Participant is entitled to receive a monthly benefit payable for life . . . in an amount equal to the sum of (A) . . . [and] (C) as follows:

---

[10] The record also refers to this as "rolled up 1987 accrued benefit." *See, e.g.,* Tr. 238.

(A) For each year of Benefit Service after December 31, 1987, 1 percent of the Participant's Highest Average Earnings.

\* \* \*

(C) For each year or partial year of Benefit Service after February 28, 1975, and before January 1, 1988, 1 percent of the Participant's Monthly Earnings during each Plan Year.

Tr. 38-39.

Based on its records of Plaintiff's earnings, HMC used $24,957 as Plaintiff's annual earnings for 1987 to calculate her pre-1988 monthly accrued benefit. Plaintiff asserts that HMC's use of $24,957 was arbitrary and unreasonable because HMC's 1987 payroll records provided to Plaintiff reflect a total of $22,322.69 for pay periods 5 through 26, but they do not contain information for pay periods 1 through 4. In addition, Plaintiff notes that her Social Security statement indicates she had taxed earnings of $29,277 in 1987 and Plaintiff testifies in her Second Affidavit that she did not have any other source of income in 1987. ECF 41 at ¶ 2.

HMC states in its Response that it was implementing a new payroll system and, therefore, Plaintiff's pay for pay periods 1 through 4 did not "appear[] on the screenshots" provided to Plaintiff "until the system was fully installed." HMC's Resp., ECF 36, at 21 n.9. In its Response, however, HMC does not provide specific pay period information for 1987 pay periods 1 through 4, rather it points to a screen shot of pay period 5 that reflects "gross pay" of $4,761.36.[11] Tr. 762-63, HMC's Resp. to Pl.'s Mot. for Summ. J. at 21. As Plaintiff notes in her Reply, however, this information undermines HMC's use of $24,957 as Plaintiff's annual earnings in 1987. Specifically, as noted, HMC's 1987 payroll records in evidence reflect gross earnings for Plaintiff in pay periods 5 through 26 of $22,322.69.[12] Tr. 762-63. If the gross pay of $4,761.36

---

[11] It is unclear from the record whether $4,761.36 is Plaintiff's accrued gross pay for pay periods 1-5 or if it is Plaintiff's accrued gross pay for pay periods 1-4.
[12] This amount does not include a possible duplicate entry of $1,051.21 in pay period 24. Tr. 762.

shown on the screenshot provided by HMC in its Response excludes the $1,076.00 earnings for pay period 5, Plaintiff's total earnings in 1987 were $27,084.05.[13] If the pay period 5 gross pay includes the $1,076.00 earnings for pay period 5, Plaintiff's total earnings in 1987 were $26,008.05.[14] If the $1,051.21 in pay period 24 was not a duplicate entry, Plaintiff's 1987 annual earnings were either $28,135.26 or $27,059. Under any of the scenarios supported by HMC's records, Plaintiff's 1987 earnings were substantially higher than the $24,956.84 used by HMC in calculating Plaintiff's pre-1988 monthly accrued benefit. Moreover, none of the possible 1987 earnings match Plaintiff's earnings reported on her Social Security Earnings Record.

On this record the Court concludes HMC arbitrarily and unreasonably used $24,957 in calculating Plaintiff's pre-1988 average monthly compensation because that amount is not supported by the HMC's payroll records, Plaintiff's Social Security Earnings Record, or any other evidence in the record. Accordingly, the Court denies Defendants' Motions for Entry of Judgment as to calculation of Plaintiff's pre-1988 average monthly earnings and grants Plaintiff's Motion for Summary Judgment as to that issue.

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART HMC's Motion for Entry of Judgment Under Rule 52, ECF 30; GRANTS IN PART and DENIES IN PART Plaintiff's Motion for Summary Judgment, ECF 31; and GRANTS TRA's Motion for Entry of Judgment

---

[13] Calculated as $4,761.36 + $22,322.69.
[14] Calculated as $27,084.05 - $1,076.00 = $26,008.05.

Under Rule 52, ECF 34.

       IT IS SO ORDERED.


DATED:_____August 22, 2023_____.



_____
MARCO A. HERNÁNDEZ
United States District Judge